# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-197


**MARY ANN FRIDAY MOTTER, ET AL.**

**VERSUS**

**MINNIE LUCILLE F. LABORDE**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-87537
HONORABLE LALA B. SYLVESTER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**MARC T. AMY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, John E. Conery, and Van H. Kyzar, Judges.


**AFFIRMED.**


James Rex Fair, Jr.
Post Office Box 1228
Natchitoches, LA   71428-1228
(318) 238-3247
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Marion A. Friday, III
    Lori Friday Baldridge

Erika F. Cedars
McCoy, Roberts & Begnaud
Post Office Box 1369
Natchitoches, LA   71458
(318) 352-6495
COUNSEL FOR PLAINTIFF/APPELLEE:
    Mary Ann Friday Motte

**Nicholas E. Gasper**
**Gasper Law Firm, LLC**
**671 Hwy 171, Suite L**
**Stonewall, LA   71078**
**(318) 775-4141**
**COUNSEL FOR DEFENDANT/ APPELLANT:**
     **Minnie Lucille F. Laborde**

**AMY, Judge.**

This dispute arises from the disposition of a tract of land to their children by a husband and wife in their respective testaments. After the trial court issued a judgment of possession ordering that the land be divided according to the testaments, one of the heirs, as well as the estate of another, filed a petition to fix boundary, naming the third heir as the defendant. The trial court rendered judgment, interpreting provisions in the parents' testaments and dividing the property among the heirs. The heir against whom the boundary action was filed now appeals. For the following reasons, we affirm.

### Factual and Procedural Background

Marion Arthur Friday and Lena Racine Friday were the parents of Marion Arthur Friday, Jr., Mary Ann Friday Motter, and Minnie Lucille Friday LaBorde. In 1959, Marion, Sr. and Mrs. Friday acquired a tract of land in Natchitoches Parish. Marion, Sr. died testate on December 7, 1986. After bequeathing the eastern third of that tract of land to Marion, Jr., the center third to Ms. Motter, and the western third to Ms. LaBorde, Marion, Sr. stated in his testament:

> I further declare that there are certain improvements located in whole or in part upon the property bequeathed to Mary Ann Friday Motter and Minnie Lucille Friday LaBorde. Notwithstanding the foregoing disposition of the immovable property owned by me of the East one/third to Marion Arthur Friday, Jr.; the center one/third to Mary Ann Friday Motter; and, the West one/third to Minnie Lucille Friday LaBorde, in the event it should be determined that any of the improvements built or constructed by Minnie Lucille Friday LaBorde and Mary Ann Friday Motter should encroach upon the lot bequeathed to another, then and in that event, I will and bequeath such additional piece, parcel or strip of land to Mary Ann Friday Motter and Minnie Lucille Friday LaBorde as shall be necessary to eliminate the encroachment which additional piece, parcel or strip of land shall be donated as a part of the disposable portion of my estate not subject to collation.
>
> I further declare that there are certain improvements located on the property bequeathed to Mary Ann Friday Motter which were paid for out of funds belonging to the legal matrimonial regime

(community property) between me and my spouse. I herewith direct my executor to appraise any improvements located on the piece, parcel or lot of ground bequeathed to my daughter, Mary Ann Friday Motter, and then effect a collation in kind of the immovable or movable property left by me at my death such that each of my children inherit an equal value of my estate, on a pro rata basis, share and share alike. The executor of this, my last will and testament, being expressly authorized to collate the excess received by Mary Ann Friday Motter or any other heirs, in kind, or by taking less, all in accordance with the laws of the State of Louisiana.

On December 4, 1996, Mrs. Friday died testate, and her testament also divided the tract of land by bequeathing the eastern third to Marion, Jr., the center third to Ms. Motter, and the western third to Ms. LaBorde. In her testament, Mrs. Friday declared:

I further declare that there are certain improvements located on the property bequeathed to Mary Ann Motter Friday [sic]. Before the death of Marion A. Friday, Mary Ann Motter Friday [sic] expended her own funds improving this property to increase his comfort during his final illness. In consideration of the efforts made by Mary Ann Friday Motter to increase her father's comfort during his final illness and the funds expended by her to do so, I will and bequeath to Mary Ann Friday Motter my entire interest in and to the improvements located on the property bequeathed to Mary Ann Friday Motter.

I further declare that any gifts given to me during my lifetime by my descendants shall be returned to the donee upon my death.

On December 11, 2013, Ms. Motter and the estate of Marion, Jr.— represented by his children, Marion Arthur Friday, III, and Lori Friday Baldridge—filed a petition for probate regarding Marion, Sr.'s and Mrs. Friday's testaments. The Tenth Judicial District Court probated the testaments of Marion, Sr., and Mrs. Friday, appointing Ms. Motter as the executrix of the successions. Subsequently, Ms. Motter, the estate of Marion, Jr., and Ms. LaBorde filed a petition for possession, requesting that Marion, Sr.'s and Mrs. Friday's property be divided according to their respective testaments. The Tenth Judicial District Court issued a judgment of possession on January 29, 2014, ordering that the "property

2

of decedents, *Marion Arthur Friday and Lena Racine Friday*, be divided in the proportions as set forth in each of their last will and testament[.]"

Thereafter, on February 23, 2015, Ms. Motter, as well as Marion, III, and Ms. Baldridge as heirs of the late Marion, Jr., filed a "Petition in Boundary Action, Petition to Fix Boundary," in which they named Ms. LaBorde as a defendant. The petition stated that Ms. Motter, Marion, III, and Ms. Baldridge had ordered a survey in accordance with the abovementioned succession proceedings and judgment of possession. Further, the petition alleged:

> Defendant herein has refused to accept the survey as directed by the will of her parents, and further, disagrees as to the boundaries as written in the probate of her parents' estate.
>
> . . . .
>
> Consequently, there is a dispute as to the location of the boundary line between the property of both Plaintiff[s] and that of the Defendant. Plaintiff[s] ask[] the Court to fix the boundary line between the Plaintiffs[] and Defendant in accordance with the Judgment of possession, that was a result of the probated will of their parents previously ruled in this honorable court, and under the laws in the State of Louisiana.

In response, Ms. LaBorde filed an answer and a reconventional demand, in which she asserted:

10.

> As Marion Arthur Friday anticipated, improvements constructed by Plaintiff-in-Reconvention encroach upon the lot bequeathed to Defendant-in-Reconvention. Specifically, the majority of Plaintiff-in-Reconvention's driveway, all of her carport/garage and outbuilding, as well as at least one-third of the home in which she has lived for more than fifty (50) years are situated on the center-one-third of the Property.

11.

In accordance with the Last Will and Testament of Marion Arthur Friday, Plaintiff-in-Reconvention owns an undivided one-half interest in that portion of the center one-third of the Property on which her improvements are situated.

. . . .

13.

Accordingly, Plaintiff-in-Reconvention desires and is entitled to a judgment recognizing her ownership of the west one-third of the Property plus such additional parcel of the center one-third of the Property as is necessary to include the improvements constructed by her.

The matter proceeded to trial. Ms. LaBorde testified that her parents allowed her to build a home on their tract of land, that she moved into the newly constructed home in 1961, and that she continues to reside in that home. Regarding a driveway on the property, she stated that "[i]t was kind of poorly built in '60[,]" but that in 1961 "we got a little bit of gravel and put it on the thing and then through the years we've kept it up . . . and made a driveway out of it and had about three culverts put in there through the fifty something years." When asked who told her where to build, Ms. LaBorde answered, "[my father] marked off what I currently live on today." When asked whether that included the driveway, she replied that it did.

Regarding other improvements on the tract of land, Ms. LaBorde discussed a car shed, a metal building, and a water well. When discussing the car shed, Ms. LaBorde clarified that, at some point in time, her original car shed rotted and that she built a new one. Ms. LaBorde's son, David LaBorde, testified about the original car shed: "I know it was there when my uncle came back from Vietnam and I know it was there until I went into the service in '78." When asked whether the new car shed is in the same location as the old car shed, Ms. LaBorde

4

responded: "Within a few feet one way or the other." Additionally, Ms. LaBorde explained that she operates a crawfish business, initially running the business from a wood frame building used by her father during his lifetime and ultimately moving her business to a metal building on a concrete slab when "[Ms. Motter] took possession of her place." When asked about the selection of the location of the water well, Ms. LaBorde testified:

> [D]addy had the water well in his back yard when I moved there. . . . A hole came in the casing and it sanded in. We had to have a new well. . . . He put up $1000 and I put up $3000. He said we're gonna put that well in your backyard because I don't want anybody to ever take it from you.

She explained that, when the water well was built, "it fed at my house and my daddy's house and at that time my sister's house." However, Ms. LaBorde stated: "There's not currently any houses fed on it because the water system came through and . . . we all got on the water system."

Ms. LaBorde testified that, after her father provided the three children with a copy of his will as initially drafted, she told him that "[the division of the tract of land is] not gonna work" because "somebody's gonna be in trouble with the line going through the house." In response, as explained by Ms. LaBorde, her father added the above-quoted improvements provision to his testament the next day. She testified that she asked her father for a deed to the property and, when he told her that he could not do so, she said to him: "I've . . . built the house, now I'm telling you I'm taking it. And I took it." In this regard, Ms. LaBorde stated that she maintains the property. Additionally, David LaBorde testified that his mother and father maintained the property and that his mother does so "to this day." Ms. LaBorde stated that, while there was no fence on the property, her parents "spoke of it as my house, my place" and "respected it as mine."

5

Ms. Motter also testified at trial, explaining that her father spoke to all three children about the property. When asked what she believed her father's wishes were for the property, she responded: "I think my daddy['s] intention was to treat all three of us equally. He never showed partiality between the three kids." She stated that, at the time of her father's death, there were three houses on the tract of land—Ms. LaBorde's house, their parents' house, and a house that had belonged to their grandmother. When asked to identify which buildings were not on the tract of land in 1986 at the time of her father's death, she responded: "The [metal building on the concrete slab] directly behind my sister's house and the car shed behind daddy's shop." Ms. Motter was then asked, "So at the time of your father's death in '86, those buildings weren't there so they certainly weren't there when he prepared his will in 1982?". Ms. Motter responded, "No."

Ms. Motter was asked to review some photographs that had been admitted into evidence. When looking at one photograph, Ms. Motter explained that it was one that she took after having taken possession of their parents' house. She described a building to the left of lattice work in the photograph as being the metal building on the concrete slab. Ms. Motter was then shown another picture of the property, which she stated was taken at a wedding in July of 1993. She was asked: "Immediately to the left of [the lattice work] do you see any buildings?" To which she responded: "No. It wasn't there." Another photograph from the July 1993 wedding was shown to Ms. Motter, and a car shed was pointed out to Ms. Motter. She testified that that car shed was no longer on the property and had been torn down. Ms. Motter also testified about the driveway that Ms. LaBorde uses, explaining: "[D]addy started driving the school bus . . . I don't know what year,

I'd have to go back and look but I know he came in that driveway and parked the bus in front of his house."

Additionally, Henry Cole Gahagan testified at trial, explaining that he prepared and notarized Marion, Sr.'s last will and testament in July of 1982. When asked whether it was Marion Sr.'s wish that "his children share and share alike in [the] will[,]" Mr. Gahagan stated:

> I think that the language as I drafted it, contemplated that Mr. Friday was uncertain if there was a current present encroachment on the property as of the date but he was making a carve out or a safe harbor in the event that there was. . . . And the, the understanding that I recall . . . is that there were no improvement survey[s] that would have provided me with guidance on the testamentary bequest to be made by Mr. Friday. And therefore the language had to reflect what may have existed on the ground at that time without the benefit of an improvement survey.

Regarding the improvements and encroachments, Mr. Gahagan further testified that "had there been a prospective request I would have separately provided for that."

The trial court rendered judgment, ordering that the boundaries of each party's respective one-third ownership in the tract of land be fixed according to a survey attached to the judgment. In the judgment, the trial court stated:

> Here, the "improvements" mentioned in the respective wills of Marion Arthur Friday and of Lena Racine Friday to be accommodated in the equal parceling of the subject family land were intended to be those in place at the time of their deaths. At that time, only the parties' individual homes existed. The evidence demonstrates that if the property was parceled out with each party receiving one third as designated in the will, two of [the] party's homes would encroach upon each other's parcel.

> Defendant, Ms. LaBorde, insists that the subject improvements accommodation text was intended to include all future improvements as well. This court demurs. Via the competent drafting of the wills, the identical language used in both wills introducing the improvement accommodation text, in this court's opinion, resolves the issue. Each testator stated at the beginning of the subject paragraph, "I further declare that there **are** certain improvements located on the property

7

bequeathed to Mary Ann Friday Motter..." [Emphasis added]. The testator's use of the present tense clearly reveals that the following accommodation was for those improvements *known to them at the time of drafting*. . . . Had it been the testators' wish to include future improvements in the accommodation, appropriate language would have been used. Fortunately, no other improvements were built between the date of execution of the wills and the testators' deaths, freeing the court from discerning the fate of post-will/pre-death improvements.

. . . .

The boundaries fixed herein are the best equitably possible.

Ms. LaBorde now appeals that judgment, asserting the following assignments of error:

1.     The court incorrectly interpreted the testaments of Marion and Lena Friday and failed to account for improvements that existed at the time of their deaths, specifically improvements constructed by Minnie LaBorde that encroach upon the center one-third of the property.

2.     The court failed to recognize that Minnie Lucille LaBorde has become the owner of a portion of the property, beyond the west one-third, through acquisitive prescription.

**Discussion**

*Interpretation of Testaments*

In her first assignment of error, Ms. LaBorde asserts that the trial court incorrectly interpreted the testaments of Marion, Sr. and Mrs. Friday and failed to account for improvements that existed at the time of their deaths. As the assignment of error is framed, Ms. LaBorde appears to agree with the trial court's determination that the improvements provision applies only to those improvements in place at the death of the testators. However, she disagrees with the trial court's conclusion that the only improvements in place at that time were the three houses.[1]

---

[1] In briefing to this court, Ms. LaBorde argues:

8

In determining the provisions of a testament as the trial court was called upon to do in this boundary action, the intent of the testator is the paramount consideration. *Succession of Tyson*, 30,703 (La.App. 2 Cir. 6/26/98), 716 So.2d 148. If a testament contains ambiguity, then a court may examine extrinsic evidence and circumstances that shed light on the testator's intentions to resolve the ambiguity. *Succession of Hackney*, 97-859 (La.App. 3 Cir. 2/4/98), 707 So.2d 1302, *writ denied*, 98-0596 (La. 4/24/98), 717 So.2d 1172. As this court has explained, in cases in which a testament is contested, the factual findings of the trial court are entitled to great weight and should not be disturbed on appeal absent manifest error. *Estate of Doucet*, 94-61, 94-62 (La.App. 3 Cir. 10/5/94), 643 So.2d 882. Additionally, this court has stated: "Resolution of conflicts in testimony and credibility determinations in succession proceedings are within the province of the trial court." *Succession of Young*, 96-1206, p. 4 (La.App. 3 Cir. 3/5/97), 692 So.2d 1149, 1151. Accordingly, "they may not be overturned on appeal unless manifestly erroneous or clearly wrong." *Id.*

---

The judgment interpreted the [] improvements clause to apply only to those improvements in place at the death of the testator. . . . Ms. LaBorde does agree with the court's interpretation of the clause.

. . . .

The language of Marion Friday's testament is very clear. It was his intent that any improvement encroaching upon the property bequeathed to another shall belong to the person that built that improvement. If Mr. Friday had intended for the improvements to be limited to only houses, he could have easily used the word "house" instead of the word "improvement." His use of the word "improvement" makes it very clear that he intended to provide for encroachment of any improvements, not just a house. Accordingly, Ms. LaBorde's boundary should be established to provide her ownership of all of her improvements, including, but not limited to, her home, her sewer system, her water well, her driveway, and her car shed.

. . . .

The judgment erroneously states that at the time that the wills were written "only the parties' individual homes existed."

As discussed above, the trial court concluded that "the 'improvements' mentioned in the respective wills of Marion Arthur Friday and of Lena Racine Friday to be accommodated in the equal parceling of the subject family land were intended to be those in place at the time of their deaths." Mr. Gahagan testified:

> [T]he language as I drafted it, contemplated that Mr. Friday was uncertain if there was a current present encroachment on the property as of the date but he was making a carve out or a safe harbor in the event that there was. . . . And therefore the language had to reflect what may have existed on the ground at that time[.]

He further stated: "[H]ad there been a prospective request I would have separately provided for that." As noted above, Ms. LaBorde does not appear to contest the trial court's determination that the improvements clauses referred to those improvements in existence at the death of the testators. Considering the foregoing testimony and the record as a whole, we find no manifest error in that conclusion.

Neither do we disturb the trial court's determination that the subject improvements were limited to the three houses, and did not include the sundry constructions claimed by Ms. LaBorde. Particularly, Ms. LaBorde suggests that her father's use of the term "improvement" in the testament rather than "house" requires a determination that all constructions be included in the boundary determination. She globally asserts in her brief that her "boundary should be established to provide her ownership of all of her improvements, including, but not limited to, her home, her sewer system, her water well, her driveway, and her car shed." Ms. LaBorde contends that to otherwise limit the term "improvement" would disregard her father's intent.

However, we conclude that the trial court did, in fact, consider Mr. Friday's intent in its consideration of the term "improvement" in light of the facts of the parties' possession as established at trial. Importantly, the trial court explained that

10

the interpretation urged by Ms. LaBorde would have permitted each of the children "lawful carte blanche to build encroachments across the breadth of the family land with the resolve of an owner and leaving collation to console the loser. Such a Manifest Destiny approach to the subject clause defeats the testator's uncontested intent to equally divide the family property among the children."

First, reference to the exhibit by which Ms. LaBorde demonstrated her preferred boundary reveals the breadth of her advanced encroachment claim and the limited means by which the other siblings could be accommodated by equal measure. As remarked upon by the trial court, such a finding would be contrary to an intent of equal division.

Additionally, the evidence as to the time of origin and the use of the claimed constructions does not mandate a finding in favor of Ms. LaBorde's position. While Ms. LaBorde pleas for the collective inclusion of various constructions, she pointedly contests the trial court's failure to include a driveway and a car shed. With regard to her claim for a driveway that she uses to access her home, Ms. LaBorde testified that she began building the driveway in 1960-1961, adding gravel and culverts to the area over the years. This latter time period was not defined. Yet, the record further evidences the use of the driveway not only for access to Ms. LaBorde's home, but for the larger shared property. When Ms. Motter was asked "[h]ow long has that driveway been there[,]" she explained that, although she could not recall what year her father began driving a school bus, she was aware that "he came in that driveway and parked the bus in front of his house." Ms. Motter confirmed that Ms. LaBorde also uses the driveway, but further remarked that "the driveway comes up and it kind of branches off right there and comes … towards daddy's carport." And, in fact, reference to the survey

11

submitted into evidence indicates that, although the subject driveway enters the property from the road frontage attendant to the western third of the tract designated for Ms. LaBorde, the driveway extends well into the center third of the tract on which the decedents resided and which was ultimately designated for Ms. Motter. The evidence is similarly tenuous with regard to Ms. LaBorde's claim for a car shed as the trial court heard conflicting testimony about the locations of both an original and a newer car shed. And, in fact, the timeline of the construction of the newer car shed was not established. For these reasons, we find no manifest error in the trial court's conclusion that neither the driveway nor the car shed was included in the improvements as described by Marion, Sr.'s will.

*Acquisitive Prescription*

In her second assignment of error, Ms. LaBorde argues that she has become the owner of a portion of the property, beyond the west one-third, via acquisitive prescription. While she did not specifically plead the concept of acquisitive prescription before the trial court, in briefing to this court, she asserts:

> The interpretation of the will is a factor to be considered in this matter, but the inquiry should not have stopped there. This suit is a boundary action. When faced with a boundary action, Code of Civil Procedure article 3693 requires that the court render judgment fixing the boundary in accordance with the ownership or possession of the parties. Civil Code article 792 further provides that the court shall fix the boundary according to the ownership of the parties; if neither party proves ownership, the boundary shall be fixed according to the limits established by possession. Therefore, a boundary action requires the court to consider[] not only title to the property but also acquisitive prescription.

Ms. LaBorde contends that the trial court "never even considered acquisitive prescription and never considered the law concerning a boundary action."

While the trial court did not specifically address acquisitive prescription in the judgment, we find no merit in Ms. LaBorde's contention that the trial court was

required to do so.  As Ms. LaBorde noted, La.Code Civ.P. art. 3693 provides that, in a boundary action, "the court shall render judgment fixing the boundary between the contiguous lands in accordance with the ownership or possession of the parties."

Procedural law, such as La.Code Civ.P. art. 3693, guides the enforcement of substantive law.  In that latter regard, Louisiana Civil Code Article 792 (emphasis added) provides: "The court shall fix the boundary according to the ownership of the parties; *if neither party proves ownership*, the boundary shall be fixed according to limits established by possession."  Here, however, the trial court concluded that ownership of the tract of land was proven by the testaments of Marion, Sr. and Mrs. Friday.  As discussed above, we find no manifest error in the trial court's division of the tract of land.

Moreover, the record before the court is simply not one requiring the trial court to have found ownership by acquisitive prescription.  According to La.Civ.Code art. 3486, "[o]wnership and other real rights in immovables may be acquired by the prescription of thirty years without the need of just title or possession in good faith."  This court has explained that the party who asserts acquisitive prescription bears the burden of proving all of the essential facts to support it.  *Crowell Land & Mineral Corp. v. Funderburk*, 96-1123 (La.App. 3 Cir. 3/5/96), 692 So.2d 535.  Whether a party has possessed property for purposes of thirty-year acquisitive prescription is a determination of fact by the trial court, and it should not be disturbed on appeal unless it is clearly wrong.  *Meritt v. Brennan*, 08-973 (La.App. 3 Cir. 2/4/09), 3 So.3d 646.  Significantly, La.Civ.Code art. 3477 explains that "[a]cquisitive prescription does not run in favor of a precarious possessor[.]"  Precarious possession is defined in La.Civ.Code art. 3437 as "[t]he

13

exercise of possession over a thing with the permission of or on behalf of the owner or possessor[.]" According to La.Civ.Code art. 3439, a precarious possessor "commences to possess for himself when he gives actual notice of this intent to the person on whose behalf he is possessing."

Ms. LaBorde's testimony indicates that her possession was exercised with the permission of her parents, who owned the tract of land. As discussed above, Ms. LaBorde testified that she told her father: "I've . . . built the house, now I'm telling you I'm taking it. And I took it." Even if construed as notice of Ms. LaBorde's intent to possess for herself, the statement appears to relate only to the house Ms. LaBorde built. As discussed above, Ms. LaBorde retains ownership of that house according to the trial court's judgment and attached survey. Following the deaths of Marion, Sr. in 1986 and Mrs. Friday in 1996, the record indicates that Ms. LaBorde's possession was not exercised in an adverse manner until the difficulties surrounding the present matter arose, well after the date necessary for acquisitive prescription purposes. Accordingly, we conclude that the trial court was not clearly wrong in failing to recognize that Ms. LaBorde has become the owner of a portion of the property beyond the west one-third via acquisitive prescription. Rather, this assignment lacks merit.

### DECREE

For the foregoing reasons, the judgment of the trial court, fixing the parties' respective boundaries, is affirmed. All costs of this appeal are assessed against Minnie Lucille Friday LaBorde.

**AFFIRMED**

14